**UNITED STATES of America,**
Plaintiff,

v.

**CERTAIN INTERESTS IN PROPERTY IN CASCADE COUNTY, MONTANA,** Harsh Montana Corporation, et al., Defendants.

**Civ. No. 1952.**

United States District Court
D. Montana,
Great Falls Division.

May 16, 1962.

Robert M. McKee, Dept. of Justice, Washington, D. C.; Moody Brickett, U. S. Atty., Butte, Mont., and Krest Cyr, Butte, Mont., for plaintiff.

Hutchinson, Schwab & Burdick, Portland, Or., and Church, Harris, Johnson & Williams, Great Falls, Mont., for defendant Harsh Montana Corporation.

JAMESON, District Judge.

This is an action to determine just compensation for the leasehold interest (and rights arising out of easements and contracts) of the defendant Harsh Montana Corporation in a Wherry Housing Project located at Malmstrom Air Force

Base, Great Falls, Montana. The action was brought pursuant to the Housing Act of 1956, approved August 7, 1956 (42 U.S.C.A. § 1594a, 70 Stat. 1110), as amended by Act of Congress approved July 12, 1957 (Pub.L. 85–104, Title V, § 504, 71 Stat. 303), requiring that the Secretary of Defense acquire, by purchase or condemnation, all Wherry housing units located at military installations where construction of Capehart family housing had been approved.

The property was taken on November 1, 1957. The original declaration of taking estimated just compensation at $1.00. An amendment to the declaration of taking filed January 29, 1958, estimated just compensation at $75,000.00. On February 23, 1960, defendant filed a motion for order requiring a further increase to not less than $476,800.00. At a hearing on this motion counsel for plaintiff informed the court that it had received an appraisal in the sum of $141,503.00, upon which plaintiff intended to rely at the trial. Pursuant to order entered May 29, 1960, plaintiff paid the additional sum of $66,503.00, with interest from the date of taking.

The Wherry Housing Act of August 8, 1949, was enacted by Congress to "assist in relieving the acute shortage of housing" at military installations and "to increase the supply of rental housing accommodations available to military and civilian personnel at such installations * * * ".[1] The Act provided for the construction of the needed housing by private builders or "sponsors".[2] The Federal Housing Administration was authorized to insure mortgages executed under the Act. The buildings and equipment on the project were constructed in accordance with detailed plans and specifications approved by the Air Force and Federal Housing Administration. The sponsor mortgagors were subject to regulation in such matters as rents, charges, capital structure, rate of return, and methods of operation.

On January 15, 1952, the defendant Harsh Montana entered into a 75-year lease[3] with the Secretary of the Air Force, at an annual rental of $100.00, for the purpose of enabling Harsh to construct a housing project upon the leased lands, consisting of 39.582 acres. Concurrently with the execution of the lease there were executed easements and contracts relating to utility services.

On September 11, 1953, Harsh completed construction of a total of 64 residential buildings, providing 400 dwelling units,[4] and 33 garage structures providing space for 196 cars, together with a gas system, water system, sewage system, roads, walks, and landscaping. Title to the buildings and other improvements passed to the Government upon their completion. The lessee also furnished ranges, refrigerators, screens and shades.

Harsh's final estimate of the cost of construction, upon which the maximum

1. 63 Stat. 570; 12 U.S.C.A. § 1748 et seq.

2. The Act was concisely explained by Senator Wherry, its author, as follows: "There are three requisites that must be provided in this legislation if it is to be successful: The program must be attractive to the builder or else you will get no construction; it must be attractive to the mortgage banker who supplies the money; the project must be made attractive to the Federal Housing Authority to enable it to set rental prices within the reach of families in the lower income brackets as well as in the higher brackets." S.Rep. No. 231, 85th Cong., 1st Sess., p. 11.

3. The lease ran from January 15, 1952. The remaining life of the lease on November 1, 1957, accordingly was 69 years, two and one-half months. The Government had the option of cancelling the lease on 60 days notice at any time after 50 years and six months from the date of the lease.

4. Four duplex family homes with living room, dining room, kitchen, bath, and three bedrooms, and 396 units in 62 multiple family buildings containing four, six and eight apartments, each containing a living room, dining room, kitchen, bath, and two or three bedrooms, for a total of 2018 rooms.

insurable interest and rental income were based, was $3,565,206.00.[5]

On October 14, 1953, the defendant Harsh became indebted to Manufacturers' Trust Company in the sum of $3,208,600.00, evidenced by a promissory note and secured by real and chattel mortgages. The mortgage indebtedness, bearing interest at the rate of 4% per annum, plus ½ of 1% F.H.A. premium charged for insurance, was payable in monthly installments of $14,706.08, including principal and interest, beginning April 1, 1954, and continuing to October 1, 1986. The note and mortgages were assigned to Federal National Mortgage Association on January 12, 1954. At the time of taking, the balance due on the note was $3,023,496.78.

The Wherry Act was superseded in 1955 by the Capehart Act,[6] which provided that housing constructed on military installations after its enactment would be managed by the Secretary of Defense instead of by private builders as under the Wherry Act. The Secretary of Defense could, in his discretion, acquire existing Wherry housing projects. Where Capehart housing was to be constructed on a military base already served by Wherry housing, acquisition of the Wherry housing was mandatory. This action was instituted pursuant to the latter provision, acquisition having been made necessary by the construction of Capehart housing on Malmstrom Air Force Base, and the failure of negotiations for a voluntary sale.[7]

Defendant alleged in its answer that the complaint failed to state a claim, because plaintiff had failed and refused to enter into negotiations with defendant to acquire the project as a condition precedent to the institution of this action, pursuant to the Housing Act of 1956, as amended by the 1957 Act. This court held in an opinion filed June 23, 1958, that the evidence disclosed bona fide negotiations by both parties pursuant to the Housing Act of 1956, which terminated in disagreement, and that neither party requested further negotiations pursuant to the 1957 amendment. The court also denied defendant's motion for appointment of commissioners to determine the issue of just compensation. By subsequent stipulation of counsel, the cause was tried to the court without a jury, followed by extensive post-trial briefs. Pursuant to agreement of counsel at the time of trial, the court viewed the premises.

The property condemned is Harsh's interest or equity in the leasehold. Two qualified expert witnesses or appraisers testified for each side. They had testified in prior Wherry cases.[8] All were obviously and understandably partisan, as reflected in their opinions of just compensation:

| | Total Value of Equity | Per Unit Value |
|---|---|---|
| J. L. Vaughan, Jr. | $1,126,503.00 | $2,816.00 |
| O. C. Brothers | 1,099,866.00 | 2,749.00 |
| William Mollan | 189,000.00 | 472.00 |
| Robert C. Hastings | 176,500.00 | 441.00 |

5. The amount of insurance and rentals were based on either the F.H.A. estimate of cost or the builder's estimate, whichever was lower. The F.H.A.'s final estimate was $3,658,308.00. The amount of insurance represented 90% of the builder's estimate of $3,565,206.00.

6. 69 Stat. 646, 42 U.S.C.A. § 1594.

7. See United States v. Benning Housing Corporation, 5 Cir. 1960, 276 F.2d 248, 252, footnote 17, for further discussion of the Wherry and Capehart Acts.

8. Vaughan, Mollan and Hastings testified in United States v. Certain Interest in Property in Hillsborough County, State of Florida, Tampa Bay Garden Apartments, et al., S.D.Fla.1958, 161 F.Supp. 424, aff'd 5 Cir. 1961, 294 F.2d 598.

748

■■ Harsh Montana is entitled to just compensation for the property condemned. The test of just compensation is "market value fairly determined". Market value "is what a willing buyer would pay in cash to a willing seller" for the estate or interest being valued.[9] Where there is an established market through sales of comparable property in the same vicinity, it is relatively simple to determine market value. In the absence of any "going market", the problem becomes more difficult. Then, "[The] amount can be determined only by a guess, as well informed as possible, as to what the equivalent (value) would probably have been had a voluntary exchange taken place".[10] This concept has special relevance here. Not only is there no "going market", but also a unique estate was taken, involving many intangible and uncertain factors which make difficult the application of any of the standard and recognized approaches to the valuation of property.[11] Obviously this accounts in part for the wide variation in the appraisals for the respective parties.

Malmstrom Air Force Base, located approximately four and one-half miles from the center of Great Falls, is an installation of the Strategic Air Command, with responsibility in refueling. It is also the Headquarters of the 29th Air Division Defense. At the time of taking, new construction related to future housing requirements included a Semi-Automatic Ground Environment (SAGE) structure being built at an approximate cost of $5,000,000.00. In addition to the 400 housing units involved in this action, there were 192 other Wherry units and 150 Capehart units, and the construction of 560 additional Capehart units was contemplated. More than 4500 military and civilian personnel were employed on the base. The demand for low-cost base housing was greatly in excess of the housing available. During the years 1953–54 and 1954–55, the rate of occupancy of the Wherry project was in excess of 98%. In 1955–56, it was 99.6%, and in 1956–57, it was 99.8%.

Appraisers for both parties agreed that the Great Falls metropolitan area at the time of taking had a population in excess of 70,000; that Great Falls is an industrial and marketing city, its area activities including agriculture, livestock, wool, minerals and oil; that it is a gateway to a well-known resort and recreational area; that five hydroelectric plants are operated in the immediate vicinity of Great Falls, and that Anaconda Company refines copper and zinc, and manufactures aluminum and copper wire and cable. In personnel and dollar volume of business Malmstrom Air Force Base was the most important segment of the city's economy.[12]

In the realm of intangible factors, it seems advisable at the outset to consider two related contentions of the plaintiff, by reason of their effect upon various factors considered by the appraisers in their valuations. Plaintiff argues first that at the time of construction the

9. United States v. Miller, 1943, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336; Olson v. United States, 1934, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236.

10. Kimball Laundry Co. v. United States, 1949, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765, where the court said further: "(W)hen the property is of a kind seldom exchanged, it has no 'market price,' and then recourse must be had to other means of ascertaining value, * * *. These considerations have special relevance where 'property' is 'taken' not in fee but for an indeterminate period."

11. See United States v. 190.71 Acres of Land, etc., Corbetta-Price Company, Inc., et al., 7 Cir., 1962, 300 F.2d 52.

12. Plaintiff offered testimony showing that the number of wage earners employed at Malmstrom Air Force Base exceeded the total for all of the leading industries in Great Falls. While defendant questioned the accuracy of plaintiff's figures, defendant included service personnel. Obviously, service personnel is increased whether the wage earners are employed at Malmstrom or in private industry.

Wherry Housing Project was relatively free from competition but that, "During the interim between the date of construction and the date of taking * * * the City of Great Falls has done considerable building in the direction of Malmstrom Air Force Base, and this lack of competition has practically evaporated." It is true that there had been substantial building in the direction of Malmstrom. There is no evidence, however, to support a conclusion that the lack of competition had practically evaporated. There was still a housing shortage, although by no means as acute. The rentals in the private housing were not competitive, and the Wherry units were wholly inadequate to meet the demand for low-cost base housing. Otherwise, it seems unlikely that the Government would have contemplated such extensive construction under the Capehart Act.

Plaintiff next argues that any prudent buyer at the time of taking would have considered the possibility of the abandonment of Malmstrom Air Force Base. Counsel refer to the testimony of one of plaintiff's appraisers that 10.4% of the Wherry projects had gone into default even in the years "when the Secretary of Defense had certified that there was no present intention to curtail activities at the respective bases"; and that at the time of taking the retention studies showed that between 70 and 80 bases were to be closed. Counsel continues, "One needs only to read the newspapers to realize the transitory period which is being witnessed in military activities. There are the closing of bases, the opening of new bases, changing of missions and, perhaps most of all, there is the changing of techniques of warfare."

At the time of taking, any possibility of abandonment of Malmstrom Air Force Base, by reason of its strategic location, was exceedingly remote. The base was expanding in activities and personnel. It was being used in meeting the demands arising from new techniques of warfare. There is no question, of course, that if Malmstrom Air Force Base were *abandoned,* it would be a severe blow to the economy of Great Falls. There is little likelihood that the resulting vacancies could be absorbed in the foreseeable future. Private investors in housing and other property, as well as the Wherry sponsor, would take a severe loss. If the activities were to be sharply *curtailed,* the investors in private housing, with their higher costs and rentals, would suffer before a Wherry sponsor. In fact, with the demand for low-cost housing on the base, unless the personnel were reduced very substantially, the Wherry sponsor would still have ample occupants for its dwelling units.

It is true, as plaintiff contends, that in determining just compensation on the basis of future income, we are concerned with what the "well informed buyer and seller think when they enter the market place". In other words, on the basis of the best information available, we must guess what these mythical parties would have considered and what importance they would have attached to the various factors suggested by the respective parties and their appraisers. To what extent would a buyer (and seller) of the leasehold interest of Harsh Montana have considered the possible abandonment of Malmstrom Air Force Base? The best answer is found in the plaintiff's own reference to the very substantial building in the direction of Malmstrom. If the investors in the apartments and houses in that area had shared plaintiff's concern with respect to the future of Malmstrom, it seems unlikely that they would have continued, as they admittedly did, to make substantial investments in housing in that area. And while 10% of the Wherry projects may have been in default, there is no evidence to support a conclusion that this was likely to happen at Malmstrom. At the time of taking it was a successful and profitable project. Certainly there was no evidence to show that it was reasonably probable that Malmstrom Air Force Base would be abandoned. Plaintiff's contention is based solely upon conjectures and possibili-

ties that appeared remote at the time of taking, as they do today.[13]

In condemnation actions there are three recognized approaches to the valuation of property: (1) the market data approach or consideration of comparable sales; (2) the reproduction cost at the time of taking, less depreciation; and (3) the income approach or capitalization of projected income.

■ With respect to the market data approach, no evidence was offered of any sales of similar property as substantive proof of the value of the property taken. The plaintiff's appraisers testified regarding the sales of the stock in three Wherry projects in support of their selection of a capitalization rate. Where evidence of comparable sales is offered in support of, or as background for, opinion testimony and not as independent evidence of value, the foundation requirements to show similarity are less strict. Where the expert has made careful inquiry into the facts, he should be permitted to give the details of the sales upon which his opinion is based. If he has not made careful inquiry or the facts do not support his opinion, this may be developed on cross-examination.[14]

■ Plaintiff's expert witnesses testified regarding sales of all the corporate stock in three Wherry projects: Shreveport Suburban Housing Corp., Barksdale Air Base, Shreveport, Louisiana; Thomason Park, Inc., Marine Base, Quantico, Virginia; and Fort Devens Manor, Inc., Fort Devens, Ayers, Massachusetts.[15] Three cases decided by the Court of Appeals of the Fifth Circuit have considered the question of comparability of the same sales. In United States v. Benning Housing Corporation, 1960, 276 F.2d 248, the trial court had found the sales comparable. On appeal in that case and again in United States v. Leavell & Ponder, Inc., 1961, 286 F.2d 398, 407, the Court of Appeals held that, "In view of the size of these projects and their potential attraction to others besides local investors * * * such sales are proper for consideration * * *".

In United States v. Tampa Bay Garden Apartments, Inc., 294 F.2d 598, the most recent case in the Fifth Circuit, both the commission[16] and trial court[17] found

---

13. See United States v. Certain Interests in Property, etc., E.D.N.C.1960, 185 F.Supp. 555.

14. See United States v. Johnson, 9 Cir. 1960, 285 F.2d 35, 40, and cases there cited.

15. Mollan arrived at equity prices and per unit values as follows:

|  | No. of Units | Overall Price of Real Estate | Equity | Equity Price Per Unit |
|---|---|---|---|---|
| Barksdale | 692 | $5,265,543 | $225,513 | $326 |
| Quantico | 450 | 3,777,960 | 192,850 | 429 |
| Devens | 202 | 1,926,591 | 138,803 | 687 |

Hastings' figures are as follows: Barksdale, equity price—$230,097, unit price—$332; Quantico, equity price—$231,688, unit price—$514; Devens, equity price—$197,451 unit price—$977.

---

16. The report of the Commission read in part: "The expert witnesses for the plaintiff (including Mollan and Hastings) are in disagreement with the expert witnesses for the defendant (including Vaughan) as to whether or not there exist sales of leaseholds that are comparable to leaseholds that are involved in this case. The defendant's expert witnesses are of the opinion that there are no comparable sales. The expert witnesses for the plaintiff point to three sales. These sales are remote as to time and in our opinion the properties involved were not sufficiently comparable to the leasehold here involved to be material to this case."

17. The findings of the trial court include the following: "The court finds that because (1) said sales were remote in point

that the same sales were not comparable. In affirming, the Court of Appeals said in part:

"We do not think the United States is now contending that the three Wherry sales should have been treated by the Commission as evidence of a value, as a basis for determining just compensation, under the separate and independent comparable sales method of appraisal. If it be so contended, then we do not hesitate to say that it has not been shown that the district court's finding is clearly erroneous.

\* \* \*

"We do not find that either the Commission or the court excluded consideration of the Wherry project sales as one of the considerable number of factors going into the complicated process of determining the value of a Wherry Act leasehold interest by the capitalization of income method. The Government's appraisers did so consider the other sales giving varying weights to such data."

If the evidence of the three Wherry sales were offered as substantive proof of value, I would hold that plaintiff had failed to meet the foundation require-

ments of comparability. It is my conclusion, however, that it was proper to permit plaintiff's appraisers to testify regarding these sales in support of their selection of a capitalization rate and to give their reasons for considering the sales comparable.[18] On this point there was a sharp conflict in the opinion of the expert witnesses, the defendant's appraisers taking the position that the sales were not comparable and giving reasons for their conclusion. As the court well said in United States v. Tampa Bay Garden Apartments, Inc., supra, these sales have been considered as a factor in "the complicated process of determining the value of a Wherry Act leasehold interest by the capitalization of income method". By reason of the dissimilarities suggested by the trial court in the Tampa case, however, they are of limited probative value.[19]

■ The defendant offered evidence of the cost of reproduction new less depreciation. Plaintiff's objection to this evidence as substantive proof of value was sustained. The expert witnesses were permitted to testify that they had considered reproduction costs less depreciation to check their opinions on value, but they were not permitted to state their figures or computations.[20]

of time, (2) because of the arbitrary selection of these three sales by the witnesses, (3) the wholly dissimilar locations of the properties involved, (4) the differences in size, income and construction of improvements, and (5) the sale of corporate stock and not the sale of assets, as was the situation here, the Commission was justified in rejecting these transactions as comparable sales."

18. The distinction between the admissibility of sales as independent evidence of value and their consideration by expert appraisers was well stated in an opinion by Judge Learned Hand in United States v. Delano Park Homes, 2 Cir. 1944, 146 F.2d 473, 475. In recognizing that sales made to the United States under threat of condemnation would not be admissible under the applicable New York law as independent evidence, the court said: "Be that as it may, it would be absurd to exclude a qualified expert's appraisal because he

had considered such evidence; indeed he ought to consider it; it is part of the data on which his opinion should rest. It is just because he is an expert, and for that reason able to give its proper weight to all data, that he is allowed to appraise the property at all. No court has held, so far as we can find, that his opinion shall not be received because it is so based in part; and we should not follow its ruling, if there were one, unless we had no escape."

19. See also United States v. 190.71 Acres of Land, etc., Corbetta-Price Company, Inc., et al., 7 Cir., 1962, 300 F.2d 52.

20. This practice was followed in United States v. 70.39 Acres of Land, S.D.Cal. 1958, 164 F.Supp. 451, 489, where the court said: "We reason that if an expert states that in arriving at an opinion of fair market value of a leasehold or fee that 'reproduction cost less depreciation' would at least be one of the factors, al-

Substantive evidence of cost of reproduction less depreciation was received without objection in a number of Wherry cases.[21] The issue was squarely presented, however, in United States v. Benning Housing Corporation, 5 Cir. 1960, 276 F.2d 248, 253, where the court reversed the judgment of the district court because of the admission of this evidence. In holding that the condemnation of a leasehold under the Wherry Act is not a proper case for valuation on the basis of reproduction cost, the court called attention to the fact that the policy under the Wherry Act "has consistently been one of allowing a return based upon original cost rather than reproduction", and that such a case accordingly "must be tried on the basis of comparable sales, capitalization of income and original cost." [22]

The appraisers for both sides used the capitalization of income approach to value. This involves the determination of the present worth of future income. Under this method "the estimated net return over the estimated life of the improvements is capitalized at a rate which will provide for the recapture or amortization of the value of or investment in improvements, sometimes termed depreciation, as well as a proper return to the investor".[23] The appraisers for the respective parties employed different methods of capitalizing income. Under both methods it was necessary to determine the gross income and expenses to be deducted in arriving at net income. The method employed by defendant's appraisers then required the determination of a capitalization rate and period of capitalization. The method employed by plaintiff's appraisers required the determination of a rate of return to equity, in keeping with the market requirements for comparable investments. The differences in approach will be clarified through an analysis of the four appraisals.

*Defendant's witness Brothers* arrived at his opinion of value as follows:

1. Relying upon the rentals being collected at the time of taking and income from the sale of utilities, and deducting an allowance for vacancies (1% of dwelling rental and utility income and 5% of garage rental), he arrived at a stabilized gross income of $402,500.00 which a prudent investor could reasonably expect to receive annually over the economic life of the project.

2. By tabulating the annual operating expenses for the four years and forecasting what a prudent investor would anticipate in the future, he arrived at a stabilized expense of $121,480.00, resulting in a net annual income of $281,020.00 before payment of debt service.

3. In converting this income to present worth, he

(a) considered the "remaining economic life of the project" as 69 years (the balance of the lease term) but concluded that the net operating income would be stable for 46 years, and thereafter decline gradually to nothing at the end of the 69 years; (b) found that one dollar receivable for 46 years, discounted at 6%, had a present worth of $15.98, and one dollar receivable 46 years hence, and declining to zero in 23 years, discounted at 7% had a present worth of 42¢, making a total of $16.40 for the economic life of the project; (c) multiplied $281,020.00 by 16.40, resulting in a present worth of $4,608,728.00; and (d) estimating the cost of replacing parts for a shorter life than the project at $1,-

though not the controlling factor, in arriving at his opinion, it is difficult, as a matter of logic, to see how you can keep the expert from giving his reasons, even though one might think he was wrong." This case was affirmed in Carlstrom v. United States, 9 Cir. 1960, 275 F.2d 802, 808.

21. See, for example, United States v. Johnson, 9 Cir. 1960, 285 F.2d 35, 39.

22. As noted above, the return is not based upon the actual cost but rather upon the F.H.A. or builder's estimate of cost, whichever is lower.

23. United States v. Tampa Bay Garden Apartments, Inc., 5 Cir. 1961, 294 F.2d 598.

991,100.00, with a present value of $356,-869.00, and deducting this sum from the net income, he arrived at a total value of the lease at $4,250,000.00.[24]

4. After considering the income analysis, inspecting the property and documents which a prudent investor would examine, and other considerations, he arrived at an appraisal of $4,125,000.00, from which he deducted the balance of the mortgage indebtedness of $3,023,-497.00 and $1,637.00 for the present value of the annual rental due the United States, resulting in the value of lessee's equity of $1,099,866.00.

*Defendant's witness Vaughan* arrived at a figure of $400,000.00 gross income, actual expenses of $118,000.00, and a stabilized net income of $282,000.00. From this figure he deducted $22,000.00 as a reserve for replacements, leaving a net annual income of $260,000.00. He assumed that an investor would expect a return in 40 years, although he considered 69 years the economic life of the project.

In capitalizing the income Vaughan used the Inwood or annuity method, which is based on the premise that the income will continue at a stable level. Using a capitalization rate of 6%, the present value of one dollar for 40 years is $15.0463. Applying this factor to the estimated net income of $260,000.00 resulted in a present worth of $3,912,-038.00.

Vaughan then determined that if the balance due on the mortgage were refinanced at 4¾% (the cheapest rate available in the money market) the annual payments would be $194,108.00 instead of the current payments at 4% of $176,173.00. Capitalizing the annual saving of $17,635.00 at 6% resulted in a

present worth of $239,673.00 which Vaughan attributed to the advantage of the 4% F.H.A. loan.

Adding the savings resulting from the low interest loan to the present worth of the net income resulted in a total value of $4,151,777.00, which was rounded off at $4,150,000.00. Deducting the balance of the mortgage, Vaughan arrived at an appraisal of the lessee's equity of $1,126,-053.00. Vaughan used other techniques for checking purposes.[25]

*Plaintiff's witness Mollan* found that the average of gross income actually collected for 1956 and 1957 was $396,452.00. Using a 3% vacancy rate, he estimated the gross income at $389,566.00. He found that the average operating expenses and taxes for the two years amounted to $183,906.00, and arrived at a long term estimate of $153,242.00. Adding $21,-892.00 as a reserve for replacement resulted in an operating expense of $175,-134.00. Deducting this from the estimate of gross income resulted in a net income of $214,432.00.

Mollan then computed an annual debt service charge at $186,099.00 (5.8% of the original mortgage of $3,208,600.00), concluding that the net cash available each year would be the difference between the net income and the charge for debt service or $28,333.00. Assuming that the amount of income attributable to lessee's equity, i. e. $28,333.00, represented 15% of the total equity (resulting in a multiplier of 6⅔), Mollan computed the total equity at $188,887.00, which he rounded off at $189,000.00.[26]

In verifying his approach, Mollan computed what he considered to be the overall rate of return. The annual requirement for debt service of $186,099.00 represents 5.793% of the total income value

---

24. He made a similar computation, using an estimated life of the project of 45 years, resulting in the present worth of one dollar income of $15.45, the present worth of income of $4,341,759.00, present value of future replacements of $279,876.-00, and a total lease value of $4,060,000.-00. He did not, however, use these figures in his final estimate of value.

25. In using the "cash throw-off" approach for checking purposes, Vaughan arrived at a total value of $1,209,882.00.

26. Mollan made comparisons with the three Wherry projects, and, reducing incomes in those projects to 97% occupancy, determined that 14.92% represented the annual return to equity.

of $3,212,385.00 (the sum of the equity value of $188,887.00 and balance of mortgage of $3,023,498.00). The annual income attributable to equity of $28,333.00 represents .882% of the total income value, making an over-all rate of return of 6.675%. Mollan found that the over-all rate of return of the other three Wherry projects was 6.63%. He considered other federal housing projects and concluded that the 6.675 rate compared favorably with the rate of return of those projects. Dividing 100 by 6.675 results in a multiplier of 14.891. Using the Inwood tables, it was found that this would yield 6% interest and a return of the investment in 39½ years.

*Plaintiff's witness Hastings* computed the over-all rental income for 1956 and 1957, compared it with the estimate of income set forth in the project analysis of August 11, 1953, and arrived at a rental income of $374,288.00, to which he added the F.H.A. estimate of utility income of $29,520.00. Allowing 3% for vacancies, Hastings arrived at a stabilized gross income of $391,694.00. His estimate of stabilized expenses and payments to reserve for depreciation, including taxes, amounted to $174,236.00, resulting in a net operating income of $217,458.00. Deducting mortgage payments of $176,473.00 and $9,443.00 for mortgage insurance premiums, he arrived at an annual amount of $31,542.00 available to equity. He found that 17 transactions with F.H.A. financing had an average rate of equity return of 18% and three Wherry projects, 21%. Using the 18% rate, resulting in a multiplier of 5.555, he computed the annual equity return of $31,542.00 to have a present value of $175,233.00.

Hastings determined that 6.149% was the annual rate of return to satisfy the mortgage indebtedness. Capitalizing the annual debt retirement of $185,916.00 at the rate of 6.149% he arrived at a value of $3,023,500.00, to which he added the present equity value, resulting in a total value of the leasehold of $3,198,733.00. Rounding this off to $3,200,000.00 and deducting the mortgage balance resulted in appraised value of the equity of $176,500.00. In checking his appraisal, Hastings found the over-all rates of 6.8% equivalent to a compound interest factor of 14.737 and that this multiplier would yield 6% interest plus amortization over 37 years.

The wide disparity in the appraisals is due (1) to a basic difference in the method of capitalizing income; and (2) to differences in estimates of projected income and expenses and factors which should be considered in arriving at the estimates. Quite naturally plaintiff's appraisers considered the problem from the standpoint of a "willing buyer", and defendant's appraisers from the standpoint of a "willing seller".

It is easy for opposing counsel and the court to criticize both the techniques and conclusions of the obviously partisan approaches of the appraisers. To resolve and reconcile the evidentiary conflicts presents a more difficult problem. The amounts in dispute of necessity are informed guesses of the appraisers. As the court well said in United States v. Tampa Bay Garden Apartments, Inc., supra, "The judicial determination of the award in a condemnation case cannot be made by mechanical or mathematical processes, nor can the process of adjudication be governed by a fixed formula." [27] That is particularly true of Wherry cases.

By agreement of counsel the trial of this action was deferred to await the outcome of similar actions tried in various parts of the country. While some principles applicable to all Wherry cases have been established, there are still marked differences between the parties as to the proper approach and the consideration which should be given various factors in determining value. Nor have the parties been entirely consistent in the position

27. The court continued: "We do not think it is necessary that we require, in testing the district court's judgment by the clearly erroneous doctrine, a specific finding with respect to each of the evidentiary conflicts that appear in the record."

taken in different cases. There has likewise been a wide variation in awards on the basis of unit value.[28] The award of course must depend upon the proof in

28. The following table lists cases where comparable data were set forth in the decision:

CASES AFFIRMED IN APPELLATE COURTS

| | Date of Taking | No. of Units | Amt. of Mortgage | Bal. due on Mortgage | Award | Per Unit Award | |
|---|---|---|---|---|---|---|---|
| United States v. Johnson, N.D. Cal. S.D. Rafael Village, Marin Co., aff. 9 Cir. 1960, 285 F.2d 35. | 12/31/57 | 505 | $4,050,000 | $3,695,735 | $1,820,000 | $3,603 | Jury |
| United States v. Tampa Bay Garden Apartments, S.D. Fla. 1958, 161 F. Supp. 424, aff. 5 Cir. 1961, 294 F.2d 598. | 1/27/58 | 800 | 6,693,000 | 5,989,304 | 2,100,000 | 2,625 | Commission |
| Buena Vista Homes v. United States, N. Mex., aff. 10 Cir. 1960, 281 F.2d 476. | 1/2/58 | 235 | 2,043,600 | 1,922,757 | 385,000 | 1,638 | Commission |
| United States v. Certain Interests in Champaign Co., Ill., Chanute Apt., D.C., 165 F.Supp. 474, aff. 7 Cir. 1959, 271 F.2d 379. | 5/1/57 | 800 | | 6,145,694 | 954,305 | 1,194 | Judge |
| United States v. 190.-71 Acres of Land, etc., Corbetta-Price Company, Inc., 7 Cir., 1962, 300 F.2d 52. | 4/1/59 | 1000 | 8,380,500 | 7,587,301 | 2,509,632 | 2,509.62 | Jury |

DISTRICT COURT CASES

| | Date of Taking | No. of Units | Amt. of Mortgage | Bal. due on Mortgage | Award | Per Unit Award | |
|---|---|---|---|---|---|---|---|
| United States v. Certain Interests Monterey Co. Cal., N.D. Cal. S.D. 1960, 186 F.Supp. 167 | 11/1/57 | 1000 | | $8,119,396 | $1,106,000 | $1,106 | Jury |
| United States v. Certain Interests Cochise Co., Ariz. Rubenstein Development Co., D.C. Ariz. (not reported). | 3/31/58 | 500 | | 4,085,102 | 614,898 | 1,029 | Judge |

each case, but the results in the decided cases illustrate the difficulty in arriving at any definite criteria of value.

Whatever the technique employed in arriving at value, both the buyer and seller would start with the actual experience of the project at the time of taking, consider the condition of the property and all applicable contracts and regulations, and then project the anticipated income and expense for some time in the future.

## Gross Income

The following table summarizes the actual gross income for the year ending March 31, 1957, and the appraisers' estimate for the future:

|  | Actual year ending 3/31/57 | Brothers | Vaughan | Mollan | Hastings |
|---|---|---|---|---|---|
| Total rentals | $369,064 | $374,288 | $ | $368,592 | $374,288 |
| Less vacancies | 1,337 | 4,308 |  | 11,057 | 12,114 |
| Net rentals | 367,726 | 369,948 | 368,000 | 357,535 | 362,174 |
| Utilities | 31,771 | 31,452 | 31,000 | 29,877) | 29,520 |
| Miscellaneous | 1,960 | 1,100 | 1,000 | 2,156) |  |
|  | $401,457* | $402,500 | $400,000 | $389,568 | $391,694 |

* This represents an increase of $8,893.58 over the preceding year.

The total rentals of $374,288.00 used by Brothers and Hastings represented the rentals actually being collected at the date of taking—over $5,000.00 in excess of those collected for the year ending March 31, 1957, and resulting from a rental increase which became effective March 1, 1957. The actual income as of the date of taking was at the rate of approximately $406,680.00 annually.

It will be noted that the actual vacancy loss for the year ending March 31, 1957, amounted to $1,337.00. Brothers estimates a vacancy loss of $4,308.00 (1% on dwellings and 5% on garages) and Mollan and Hastings a vacancy loss of $11,057.00 and $12,114.00 respectively (3% of all income). There was no reason to anticipate any substantial change in the high rate of occupancy in the foreseeable future.[29] For the two preceding years it had averaged 99.7%. Brothers' estimate of 1% vacancy was more realistic than the 3% used by Mollan and Hastings. It is my conclusion that there was good reason to anticipate that the high occupancy actually existing at the time of taking would continue for several years, with some reduction in later years.

29. With the large percentage of military, as well as civilian, personnel living off base and paying higher rents, the high occupancy would continue in the absence of a substantial curtailment at Malmstrom Air Force Base, which was not foreseeable at the time of taking or now.

Expenses

The following table summarizes the actual and estimated expenses:

|  | Actual year ending 3/31/57 | Brothers | Vaughan | Mollan | Hastings |
|---|---|---|---|---|---|
| Administrative | $ 50,626 | $ 14,800 | $ 15,000 | $ 22,586 | $ 21,763 |
| Ad valorem taxes | 32,764* | 200 |  | 36,350 | 36,350 |
| Maintenance, repairs, decorating and painting | 52,077 | 58,000 | 55,000 | 47,109 | 49,032 |
| Other expenses | 45,554 | 48,480 | 48,000 | 47,197 | 45,199 |
|  | $181,021 | $121,480 | $118,000 | $153,242 | $152,344 |

\* The 1957 tax in the sum of $32,764.00 was cancelled by court order dated May 29, 1958.

———◆———

While the expenses are itemized in more detail in the various appraisals, I have grouped them in this manner to indicate the major differences. With respect to administrative expense, it is apparently agreed that nonrecurring legal expense and actual management fees shown on Harsh's report would not represent items properly chargeable in anticipating future expenses. It will be noted that Mollan and Hastings are approximately $7,000.00 higher than Brothers and Vaughan. This results from the addition by Mollan and Hastings of a "management fee". On the other hand, Mollan and Hastings are substantially lower in their estimates of maintenance, repairs, decorating and painting.[30] In fact, aside from taxes, the appraisers are not far apart in estimating future expenses, ranging from Hastings' $115,994.00 to Brothers' $121,280.00.[31]

A "management fee" as such is not in the same category as other administrative expenses. A willing buyer might conclude that this amount should not be deducted if he were to manage the property himself. On this point there is a sharp conflict in the testimony of the respective appraisers, which cannot be categorically and mathematically resolved. It is a factor, however, which a willing buyer would consider in projecting the net income which he might anticipate.

The replacement reserve fund had a shortage of $14,605.75, resulting from the payment of attorney fees from that fund to litigate the tax cases. Additional fees had been paid in the sum of $17,149.56, or a total of $31,755.31. Defendant claims, and I think properly, that in some manner the owner would be entitled to recoup this amount.

30. The Government in its brief states, "It is plain, and the testimony so indicates, that quite probably some of the items of maintenance expense as calculated by Messrs. Vaughan and Brothers were considered as administrative expense by Messrs. Mollan and Hastings".

31. Excluding both management expense and taxes, we have actual and estimated expenses as follows:

| Actual | Brothers | Vaughan | Mollan | Hastings |
|---|---|---|---|---|
| $97,631 | $107,480 | $103,000 | $94,306 | $94,231 |

758

The item for real estate taxes presents a more difficult problem. The sponsor's financial statement for the year ending March 31, 1957, contained an item of $36,350.00 for taxes. Mollan and Hastings have used that figure in their estimate of taxes to be deducted as a part of the stabilized income. Brothers and Vaughan have omitted this item altogether.

In my opinion neither approach is justified. On the date of taking, there was pending in the District Court of Cascade County an action for the recovery of 1957 taxes paid under protest. Plaintiff and defendant were both of the opinion that under Section 511 of the Housing Act of 1956, Public Law 1020, 84th Cong., 2d Sess., 42 U.S.C.A. § 1594 note, the assessment of taxes against defendant's property was invalid. In a judgment entered October 29, 1958, it was held that the plaintiff should have refunded 1957 taxes levied and paid under protest in the sum of $32,764.83.

The passage of Public Law 1020, the fact that an action for the recovery of taxes was pending, and that both plaintiff and defendant were of the opinion that the taxes were illegal would be known to a prospective purchaser. While he could not assume without question that Harsh Montana would prevail in its action, he would give consideration to the probability that it would do so. Certainly Harsh Montana, if a "willing seller", would take this situation into consideration. On the other hand, a prospective purchaser would also anticipate a rental adjustment in the event the taxes were held illegal, the time and amount of any adjustment being uncertain. Both parties could reasonably assume that the savings in taxes would be available for at least a short period of time, but that such savings would be taken into consideration in future determination of rentals.

This is clear from correspondence between the parties. In connection with a rental increase in 1953, Harsh agreed in a letter dated November 20, 1953 (Ex. 50) that "in the event real estate taxes are not legally assessed and located in the property involved, it will reduce the rents in the amount of $7.58 per unit per month, which is the amount of the tax now being levied". In connection with a subsequent increase in rental in 1955, by letter dated August 5, 1955 (Ex. 53) Harsh was advised that an increase of $4.29 per unit per month would be approved provided Harsh would agree, among other things, that, "(c) In the event of a reduction in taxes, the F.H.A. is to reconsider the rents and require an adjustment thereof in accordance with the findings at that time". Harsh replied by letter dated August 17, 1955 (Ex. 54):

"We do understand that in the event taxes are reduced at some subsequent date, that our operation will then be reviewed on the basis of the facts then existing and a determination then will be made as to proper rentals; in other words, that a reduction in rentals does not automatically result from a reduction of taxes."

To this letter plaintiff replied on September 8, 1955 (Ex. 55):

"This is to advise that your letter is unsatisfactory and we must insist that you comply with the conditions set forth in Mr. Duell's letter of August 5th.

"We expect to receive from you, within 15 days from the date of this letter, a letter indicating your compliance with our requirements."

On December 22, 1955, the director of the Federal Housing Administration wrote to the F.H.A. director at Helena, Montana, (Ex. 59) confirming an understanding that in the event of a tax reduction and within 30 days after the effective date of the reduction, "Funds accrued with the Federal National Mortgage Association in the tax accrual account not required for the payment of taxes may be applied in direct reduction of principal of the insured mortgage. In addition, that if a tax rebate is received in excess of $35,000, all sums rebated in excess of such amount may be applied in direct reduction to the prin-

cipal of the insured mortgage. At the time of reduction in taxes, F.H.A. will reconsider ceiling rents and require adjustments in accordance with their findings at that time." This was accepted by Harsh in letter dated January 10, 1956 (Ex. 60).

It is clear from the foregoing that while the parties had not agreed upon a precise formula for the reduction of rents upon abatement of taxes, it was contemplated by both parties that a reduction would be made, F.H.A. to reconsider the ceiling rents and require adjustments in accordance with their findings at the time of the tax reduction.

Particularly in connection with any anticipated reduction of rental by reason of the abatement of taxes, any limitations upon the expected annual income becomes significant. Accordingly it is necessary to consider what limitations, imposed either by contract or existing law or administrative policy, would be taken into consideration by a willing buyer and willing seller in "guessing" what reduction might be anticipated by reason of possible abatement of taxes.[32] Plaintiff contends that the income is limited by a "dollar amount", representing the net income allowed at the original processing, i. e. $217,439.00, as contained in the final project analysis dated August 11, 1953. Defendant Harsh contends that the limitation is 6½% of the estimated

replacement cost of either the sponsor or F.H.A., whichever is the lesser, and that in any event the amount in the project analysis is erroneous.[33]

The invitation for bids for the project, dated August 2, 1951 (Ex. 19) contained the following provision:

"Sponsors are advised that the approved rental schedule will be based upon a 'net return' not exceeding six and one half per cent of the sponsor's estimated replacement cost, or the Federal Housing Administration's estimate of replacement cost, whichever is the lesser. Further, the maximum average rental shall not exceed that approved by the services for each project. By 'net return' is meant the amount after the provision for payment of all operating expenses, reserves and taxes, and vacancy allowances but before payment of debt service."

Here the limitation would be based upon the sponsor's estimated replacement cost of $3,565,206.00.

There was received in evidence a series of Military Housing letters [34] and Administrative Rules and Regulations [35] setting forth F.H.A. policy. The first reference to "dollar amount" is contained in Letter No. 64, dated January 8, 1954 (Ex. 30), which recited in part that "the net return cannot exceed the dollar amount established in the original processing".[36]

---

32. Robert Renfro, Director of the Mortgage Insurance Division of the F. H. A., testified that under the general policy in the original processing of a Wherry project the net return would not exceed 6½% of the sponsor's or F. H. A.'s estimated replacement cost, whichever was lesser, as expressed in Military Housing Letters No. 4, 14 and 64 (see footnote 28), but that any increase in rent after the original processing would be limited by the amount of net return or dollar amount developed in the original processing.

33. There were seven project analyses. In the first, (Ex. 31) dated June 14, 1951, the estimated replacement cost was $3,-839,911.00 and the estimated net income $246,509.00, or 6.4% plus. In the final analysis (Ex. 24) dated August 11, 1953, the estimated replacement cost was $3,-

565,206.00, and the estimated net income $217,439.00, or a little over 6%.

34. Letters from the F. H. A. to "Directors of all Field Offices" included Letter No. 4 dated May 12, 1950 (Ex. 27); No. 14 dated August 10, 1951 (Ex. 28); No. 44 dated March 11, 1953 (Ex. 29); and No. 64 dated January 8, 1954 (Ex. 30).

35. These rules and regulations dated August 10, 1951 (Ex. 28) provide in pertinent part that the "net return calculated as hereinafter provided shall not exceed 6½%;" and that an increase "must be based on the fact that the present income of the project will no longer produce the approximate net return".

36. This letter also contains the following paragraph: "The same percentage formulae and general procedure shall be used in determining allowable revised rents as

I find no reference to either dollar amount or percentage limitation in any communications between the parties subsequent to the invitation to bid.

Counsel for both parties comment extensively upon correspondence between the General Counsel of F.H.A., and the Chief of the Lands Acquisition Section of the Department of Justice. A letter from the general counsel dated July 7, 1960 (Ex. 72) reads in pertinent part:

"* * * Basically, the formula was that the rental rate should not exceed a specified average dollar amount per room per month which would provide a net return of 6½%. Military housing letter No. 14, issued by the Commissioner under date of August 10, 1951, specifically provided: In * * * Title VIII cases, net return, calculated as herein provided, shall not exceed 6½%.

"The provision governing the 'net return, calculated as herein provided', was that: 'The director may approve a rent schedule which at 93% occupancy * * * will yield the appropriate net return on the actual estimated replacement cost of the residential portion of the project (including garages and land) plus required working capital.'

"* * * It is clear that all parties understood that the rent formula was aimed at a 6½% return."

The Department of Justice in reply stated that it had been the Department's understanding in accordance with Military Housing Letter No. 64 "that in Wherry housing projects the net return is to be limited to the dollar amount allowed in the original processing". A second letter from the General Counsel, dated August 8, 1960, then stated that "our letter of July 7, 1960, should have referred to a 6½% return as a maximum and the dollar amount allowed in original processing would be controlling in the enforcement of a reduction in rentals consistent with an abatement of taxes." [37]

In support of its contention that $217,439.00 is a fixed maximum, the Government relies in its post trial brief upon two letters from the Commissioner not in evidence, which the court nevertheless has considered, although both were written on August 16, 1960, almost three years after the taking. Both letters state that a Wherry owner should be afforded the opportunity of "realizing *substantially* the same dollar return as was indicated at the time the mortgage transaction was closed". (Emphasis supplied.) One letter states that "to this end we continue to approve requests for revised rental schedules to compensate for increased operating costs and taxes". Defendant objected to the court's consideration of these letters by reason of the fact they were not in evidence. When the court permitted the Government to use these letters in argument, the defendant submitted three letters [38] to show that the letters to the field offices "were never considered as having the force and

were used in establishing original rentals and the calculations must be based on the cost of replacement of the project as estimated at the time of processing the insured mortgage." Military Housing Letter No. 44 (Ex. 29) reads in part: "With respect to any request for an increase in rents, the recommendation of the insuring office will be confined to such action as is necessary to maintain the same ratio of net return to replacement cost as was effective at the time of commitment, and such net return shall be computed by use of the same vacancy factor as that assumed in the processing upon which the commitment was based."

37. It will be noted that this correspondence was almost three years subsequent to the date of taking. It is difficult to determine what effect a willing seller and buyer would give to an administrative policy that even as late as 1960 required some clarification as between the general counsel of F. H. A. and the Department of Justice.

38. Letter from Albert M. Cole, Administrator, Housing and Home Finance Agency, to Senator Byrd, dated January 5, 1956; letter from Joel C. Wise, Chief Counsel, Rental Housing Section, Legal Division, to R. W. Jefferson, dated March 18, 1957; and letter from Norman T. Mason, Commissioner, to the Honorable Joseph Campbell, the Controller General of the United States dated March 28, 1957.

effect of statutes or regulations; that they were merely the announcement of general policies and procedures for the guidance of the field personnel; and that the Commissioner was believed to have authority, for good cause shown, to change or modify the provisions of such letters at will, or, in proper cases, to make exceptions that did not follow the exact provisions of such letters".[39]

The foregoing is sufficient to indicate that a willing buyer and seller on November 1, 1957, would have considerable difficulty in determining just what limitation might be followed in arriving at the amount of any rental adjustment by reason of abatement of taxes.[40] There is no contention that a net return of 6½% was guaranteed, and it is conceded that the net return could not exceed 6½%.[41] It is my conclusion from the invitation to bid, pertinent regulations and letters, as well as the opinion of the general counsel of F.H.A. set forth in his letter of July 7, 1960, that, "It is clear that all parties understood that the rent formula was aimed at a 6½% net return." In the instant case the return in

the initial analysis was close to 6½%, but in the final analysis was barely 6%. It was the policy of F.H.A. to negotiate with the military services on rental adjustments, and consideration was given to the dollar amount contained in the project analysis, but this amount was not a fixed and controlling maximum.

The net return was based upon an estimated occupancy of 97% of the dwelling units and 100% of the garages. The Government concedes that the owner would be entitled to the benefit of any occupancy in excess of 97%.[42] Moreover, the dollar amount contained in the project analyses did not include any "profit" or "handling charge" which might be realized from utility income;[43] nor did it include "miscellaneous income" of approximately $1,900.00.

I cannot accept Vaughan's treatment of the effect of the low interest rate of 4% on the F.H.A. loan. On the other hand it would result in an earlier payout than a loan at a higher rate. Under the 4% rate the loan would have been repaid in 29 years, with the result that even though there might be a further rental

39. The Government also relies in part upon the provision in the invitation to bid that "the maximum average rental shall not exceed that approved by the Services for each project". Certainly this does not expressly provide that any "dollar amount" shall be controlling and its effect is reflected in the letter from the Commissioner to the Comptroller General dated March 28, 1957, reading in pertinent part: "We constantly follow the practice of negotiating with and obtaining concurrence of the military authorities with respect to proposed rental adjustments" * * * and "have endeavored to fix rents sufficient to meet operating expenses, fixed charges, and to provide a reasonable return to the sponsor".

40. Defendant argues that all of the pertinent documents relate to increases rather than reductions in rent. It may properly be assumed, however, that the same guides would be followed in the reduction of rent, although obviously the owner would be in a more favorable position in negotiations for a reduction of rent than in negotiating for an increase, particularly in view of the fact that the rentals were substantially below those paid by military

personnel who lived off base because of their inability to obtain base housing.

41. A table annexed to the Government's final brief, however, indicates that in some instances the net return exceeded the 6½%.

42. The letter from the Commissioner dated March 28, 1957, reads in pertinent part: " * * * We do not believe that we would be justified in arbitrarily changing this ratio in reprocessing rentals for either increases or decreases, even though we are fully aware that the project is presently substantially 100% occupied. The occupancy factor is based upon averages over a long period and we are unable to subsidize the project when occupancy falls below the contemplated ratio. Consequently, it is contemplated, and we think appropriate, that the project should realize high earnings during periods of good occupancy to average with periods of low occupancy."

43. None of the project analyses included service or utility income or expenses. The amounts charged the tenants for water, lights, and gas, exceeded the actual cost to Harsh. The amount of this ex-

reduction at that time, the elimination of the loan payment would more than offset any decline in income or increase in expenses which might otherwise be anticipated. In fact, it seems probable that the net income after debt service would increase rather than decline when the mortgage debt was paid.[44]

As noted supra, taking into consideration the increase in rental of March 1, 1957, the gross income as of the date of taking was at the rate of approximately $406,680.00 annually. Assuming an administrative expense of $15,000.00, and using the actual expenditure of $52,077.00 for maintenance, repairs, decorating and painting, and $45,554.00 for other expenses, we arrive at a net income of $294,049.00 which might reasonably be anticipated for the *first* year, before making allowance for taxes, mortgage payments, or reserve for replacements. Deducting $21,892.00 as a reserve for replacement results in a net income of $272,157.00 before debt service, if no payment were required for taxes.[45] Making further deductions of $176,473.00 annual mortgage payments and $15,117.00 insurance premiums results in a net income of $80,567.00 if no payments were required for taxes. If the taxes of $32,764.00 were not refunded, the net income would be $47,803.00 for the first

year.[46] If a management fee of $7,000.00 were deducted, all of these figures would be reduced accordingly.

While there is disagreement between the parties and appraisers regarding the inferences to be drawn from the foregoing figures, there is no substantial disagreement with respect to the figures themselves. The net income subsequent to the *first* year, however, may not be calculated with the same degree of mathematical certainty.[47]

Factors which both a willing buyer and willing seller would consider in estimating future net income include: (1) the probability that the taxes would be abated (as they were within a year), but with some risk that there would be no abatement; (2) the fact that upon abatement of taxes, a reduction in rental could be anticipated, with the time and exact amount of the reduction uncertain, with (3) a reasonable expectation that in negotiating future rental revisions, the parties would aim at a $6\frac{1}{2}\%$ net return, but with no guarantee of that return, and that some consideration would be given to the return at the time of processing and approval of the Air Force; (4) a recoupment of the attorney fees in the sum of $31,755.31 by either (a) deferring any rental reduction or (b) permitting recoupment through a lesser reduction in

|  | Mollan | Hastings |
|---|---|---|
| Gross Income | $406,680.00 | $406,680.00 |
| Expenses | 116,892.00 | 115,994.00 |
|  | 289,788.00 | 290,686.00 |
| Reserve | 21,892.00 | 21,892.00 |
| Net Income for 1st Year | $267,896.00 | $268,794.00 |

cess, whether it be termed "handling charges" or "profit", cannot be determined with accuracy due to the fact that the expense of "handling" was not segregated from other administrative expenses. This is an item of income which willing sellers and buyers could reasonably anticipate. The estimated gross income, expenses and net income hereinafter discussed include utility or service income and expenses.

44. On this point see also discussion of advantage of low interest rate in United States v. Corbetta-Price Company, Inc., et al., supra.

45. Using the gross income figure of $406,680.00 and the estimates of expense of the Government appraisers, exclusive of taxes, but including the management fee of $7,000.00, we would arrive at the following results:

46. As a practical matter, it seems probable that, in any voluntary sale, the price agreed upon would be contingent upon the outcome of the tax litigation or the consummation of the sale would be deferred until the litigation was concluded.

47. As the court well said in United States v. Corbetta-Price Company, Inc., et al., supra, "A case of this character is susceptible of much confusion and uncertainty. We doubt if there ever has or ever will be such a case tried which does not leave something to be desired."

rent; (5) the probability that the high occupancy existing at the time of taking would continue for several years with a gradual decline thereafter; (6) the fact that the lease had 69 years to run, but could be terminated after 44 years, and the probability of increased expenses and declining income during the later years; but also (7) the fact that the mortgage debt would be repaid in 29 years, and while a reduction in rentals could be anticipated at that time, the repayment of the mortgage would offset both (a) the increase in other expenses and (b) decline in income which might otherwise be anticipated after the lapse of 29 years; (8) whether $7,000.00 or any other sum should be deducted as a "management fee" if the buyer should employ someone else to manage the property; (9) the possibility of abandonment of Malmstrom Air Base, which, as indicated supra, appears to me to be remote and speculative.

Obviously the amount of net income, before taxes and debt service, of $272,157.00 would not be continued. Without attempting to give a dollar value to each of the factors enumerated in the preceding paragraph, but giving consideration to all of them and to the opinions of all of the appraisers, it is my conclusion that a fair and reasonable estimate of annual net income, before debt service, is $237,200.00; that this income could reasonably be anticipated for a period of 40 years; [48] and that a capitalization rate of 6% is proper.

Plausible arguments can be and have been advanced in support of each of the techniques employed by the various appraisers. In United States v. Tampa Bay Garden Apartments, Inc., et al., supra, many of the same problems were presented and the same techniques considered. There the trial court adopted the Inwood Coefficient method, and this method was approved by the Court of Appeals.[49] The court there also used a period of 40 years and a capitalization rate of 6%.

Multiplying the stabilized net income of $237,200.00 by the Inwood factor of 15.046 results in a total value of $3,568,911.00.[50] Deducting therefrom the amount of the mortgage remaining unpaid at the date of taking, i. e. $3,023,497.00 results in an equity value of $545,414.00. Plaintiff has paid $141,503.00. Deducting this amount leaves a balance of $403,911.00 for which judgment should be entered, with interest at 6% per annum from November 1, 1957.

48. In arriving at this average net income before debt service I have taken into consideration (1) the probability that the income for the first few years would exceed this amount, with a gradual decline at least until the mortgage debt is paid; (2) that the net return available to the owner might increase upon the repayment of the mortgage after the lapse of 29 years; and (3) that even upon the expiration of 40 years substantial income could reasonably be anticipated for the remaining period of the lease, particularly in view of the fact that the mortgage indebtedness would have been repaid.

49. The Court of Appeals said in part: "The court supported its confirmation of the Commission's award by comparing it with the figures arrived at by the court in applying the frequently used Inwood Coefficient method of appraisal, a method recognized by the American Institute of Real Estate Appraisers. The court took the stabilized annual income of $540,000 and the remaining economic life of forty years, both as found by the Commission and concurred in by the court, selected a capitalization rate of 6 per cent, which it considered fair and within the range of estimates made by the expert witnesses, and to these figures the court applied the Inwood factor of 15.046. By multiplying the stabilized annual income by the Inwood factor and then subtracting from this amount the mortgage debt as of the date of taking, the final sum was approximately the same result as that awarded by the Commission."

50. It is interesting to note that this figure approximates the sponsor's final estimate of cost of construction, i. e. $3,565,206.00.